## IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| ROBERT ORMISTON and ELIZABETH GIORDANO, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | CASE NO. 1:21-cv-4654 MHC |
| v. | : | |
| | : | |
| JULIE FREEMAN and CHRIS FREEMAN, | : | JURY TRIAL DEMANDED |
| | : | |
| Defendants. | : | |

## **COMPLAINT**

COMES NOW Plaintiffs Robert Ormiston and Elizabeth Giordano files their Complaint against Defendants Julie Freeman and Chris Freeman (the "Freemans") and respectfully shows this Court as follows:

## I. **PARTIES, JURISDICTION, AND VENUE**

1.     Julie Freeman is a resident of Georgia and may be served at her place of residence, located at 3020 Keeneland Blvd, McDonough, Georgia 30252, or wherever she may be found.

2.     Chris Freeman is a resident of Georgia and may be served as his place of residence, located at 3020 Keeneland Blvd, McDonough, Georgia 30252, or wherever he may be found.

3.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, because there is complete diversity between Plaintiffs, who are residents of Pennsylvania, and Defendants and the amount in controversy exceeds $75,000, exclusive of interest and costs.

4.      Venue is proper in this District pursuant to 28 U.S.C. § 1391, because Defendants reside within the judicial district.

## II. <u>FACTUAL BACKGROUND</u>

5.      On June 28, 2021, Ormiston and Giordano (the "Buyers"), executed an Offer and Purchase Agreement (Business Assets) (the "Agreement") for the assets of Julie Freeman's accounting practice, Creekview Accounting Services, LLC ("Creekview"). A true and correct copy of the Agreement is attached as Exhibit A.

6.      The purchase price paid by Buyers for Creekview was $625,000.

7.      Prior to executing the Agreement, the Buyers conducted certain due diligence on Creekview, relying on certain representations by Julie Freeman, including but not limited to the income and operations of Creekview, and its nature as a 100% virtual accounting practice.

8.    At the time of purchase, Julie Freeman represented to Buyers Creekview had thirty-nine clients, which included a mix of individuals, married couples, and small businesses.

9.    At the time of purchase, Julie Freeman represented to Buyers Creekview had annual income of approximately $406,217 in the prior twelve months, with an additional $79,353 in non-recurring billing.

10.    Julie Freeman also represented to Buyers that Creekview had two bookkeepers who would be continuing to work with Creekview after the sale.

11.    The bookkeepers were a material consideration given the transition period from Julie Freeman to Buyers and given the virtual nature of the practice.

12.    The Agreement also contains several representations by Julie Freeman.

13.    In relevant part, the representations are:

a)    "All the financial information and statements furnished to Buyer are complete, accurate, prepared in a manner consistent with general accounting principles, and fairly present the financial condition of the business as of the dates stated on them." ¶ 8.d.

b)    "Since the date of the last financial statements furnished, there have been no material adverse changes, in the aggregate, in the assets, liabilities, revenues, expenses, or any other items show on such statements." ¶ 8.e.

c)    "All assets currently used in the business are owned by Seller free from liens and encumbrances, and they are in good and operable condition." ¶ 8.f.

d)    "Until date of closing, Seller shall continue to operate the business in the usual way, protect its assets and goodwill, maintain good relations with suppliers, clients, and employees, and allow the Buyer to make reasonable inspections with prior consent of Seller." ¶ 8.h.

14.    The Agreement also required Julie Freeman to take certain actions after the sale of Creekview.

15.    For instance, Julie Freeman was required to provide a complete client list to the Buyers.

16.    Julie Freeman was required to participate in the orderly transition of Creekview's assets, in part, by contacting clients to inform them of the change in ownership.

17.     Julie Freeman agreed to provide operating procedures and a client contact list for Creekview.

18.     Since the sale of Creekview, the Buyers have discovered Julie Freeman's representations are untrue and fraudulent.

19.     Buyers have contacted multiple businesses identified as clients of Creekview who have stated they terminated Creekview prior to the Buyers' purchase, had not heard from Julie Freeman for months, or accused her of malpractice.

20.     Upon information and belief, thirteen of the original thirty-nine clients, representing approximately $132,170 in revenue, ended their relationship with Creekview prior to Creekview's sale.

21.     Upon information and belief, these thirteen clients told Freeman of the termination prior to the sale.

22.     Upon information and belief, ten of the original thirty-nine clients, representing approximately $114,202 in revenue have ended their relationship with Creekview after its purchase.

23.     Three of the clients who have ended their relationship with Creekview since the sale have specifically stated they only want to be represented by a local accounting practice.

24.     Six of the original thirty-nine clients, representing approximately $8,475 in revenue have been unreachable or there is no contact information for them.

25.     Five clients of the original thirty-nine complained about material mistakes in their bookkeeping and tax returns, with one client in specific stating he was preparing to sue Julie Freeman due to the mistakes.

26.     Of the original 39 clients, representing approximately $406,217 in revenue, only 10 clients, representing approximately $151,370 in revenue have stayed with Creekview.

27.     Clients who have been contacted by Buyers also stated they never received any form of notification that Creekview had been sold.

28.     Julie Freeman has not provided any material documents, client contact lists, or operating procedures to aid in the orderly transition of Creekview.

29.     Additionally, Creekview appears to have employed Julie Freeman's husband, Chris Freeman, as its primary bookkeeper.

30.     At no point did Julie Freeman disclose her husband was a key employee of Creekview.

31.     Chris Freeman represented himself to Buyers as "Chris Smith."

32.     Upon information and belief, Chris Smith is Chris Freeman.

33.    Chris Freeman has been slow or unwilling to respond to Buyers as they seek more information about Creekview.

34.    Chris Freeman was employed by Creekview as an independent contractor.

35.    Chris Freeman presented a false W-9, identifying himself as Chris Smith.

36.    Chris Freeman, posing as Chris Smith, has participated and perpetuated in Julie Freeman's fraud by slowing the transition.

37.    Chris Freeman, posing as Chris Smith, also had access to Creekview's cloud-based computer services and was able to make alterations to the books and records of Creekview.

38.    Upon discovering the Freemans' fraud, Buyers, through counsel, demanded a rescission of the Agreement and the return of the purchase price. A true and correct copy of the demand for rescission is attached as Exhibit B.

39.    Julie Freeman ignored the demand.

40.    At this time, Buyers are still investigating and discovering new evidence of fraud by the Freemans.

## III. <u>CLAIMS</u>

**Count One**
**(Fraud and Conspiracy to Commit Fraud Against Julie Freeman and Chris Freeman)**

41.    Buyers restate the previous paragraphs as if stated herein.

42.    Julie Freeman made several material misrepresentations regarding Creekview both prior to the execution of the Agreement and in the Agreement.

43.    Julie Freeman misrepresented the assets of Creekview and overstated its revenue.

44.    Julie Freeman misrepresented the number of clients and whether clients were still represented by Creekview.

45.    Julie Freeman misrepresented the financial information by including revenue from clients who had paid for services, but never actually received the services or were no longer clients.

46.    Julie Freeman provided inaccurate financial information, which is a violation of ¶ 8.d of the Agreement.

47.    The financial information provided by Julie Freeman underwent material adverse changes in the assets and revenues, which is a violation of ¶ 8.e of the Agreement.

48.     The assets used by Creekview, including its clients, were not in good and operable condition, which is a violation of ¶ 8.f of the Agreement.

49.     Julie Freeman failed to protect the assets and goodwill of Creekview, and did not maintain good relations with clients, which is a violation of ¶ 8.h of the Agreement.

50.     Chris Freeman also furthered the deception by passing himself off as Chris Smith and maintaining his employment with Creekview.

51.     Chris Freeman misrepresented himself as Chris Smith and provided a falsified W-9 to hide his involvement.

52.     Chris Freeman, posing as Chris Smith, intentionally delayed providing client documents in an effort to deceive Buyers that several clients had fired Creekview.

53.     The Freemans knew the representations they had made were untrue when they were made.

54.     The Freemans intended the Buyers to rely on their misrepresentations.

55.     Buyers reasonably relied on the representations made by the Freemans.

56.     The Freemans' fraud is the direct and proximate cause of harm to the Buyers.

57.     Buyers are entitled to judgment against the Freemans in an amount to be determined at trial, but not less than $625,000.

## Count Two
### (Negligent Misrepresentation)

58.     Buyers restate the previous paragraphs as if stated herein.

59.     Sale of the assets of Creekview was a transaction in which Defendants had a pecuniary interest.

60.     Buyers purchased the assets of Creekview in reliance on information received from Julie Freeman.

61.     Buyers attempted to utilize the assets of Creekview in reliance on information received from the Freemans.

62.     Defendants supplied false information or otherwise actively concealed material facts related to revenue and clients to Buyers.

63.     Defendants knew the information they supplied, omitted, or actively hid.

64.     Defendants intended and knew Buyers would rely on these false representations or omissions.

65.     Buyers received the false information supplied by Defendants.

66.     Buyers justifiably relied on the information from Defendants.

67.    Buyers have been damaged in an amount to be determined at trial but not less than $625,000.

## Count Three
### (Rescission)

68.    Buyers restate the previous paragraphs as if stated herein.

69.    Under the Agreement, the purchase price for the assets of Creekview was $625,000.

70.    After the execution of the Agreement, the Buyers discovered the Freemans' fraud regarding the overstatement of revenue and clients.

71.    On their and own and through counsel, the Buyers have demanded rescission of the Agreement and the return of the purchase price.

72.    Julie Freeman has not responded to the demand and has otherwise ignored Buyers.

73.    Buyers still seek a rescission of the Agreement, seeking the return of the purchase price and legal fees and returning Creekview to Julie Freeman.

## Count Four
### (Breach of Contract against Julie Freeman)

74.    Buyers restate the previous paragraphs as if stated herein.

75.    Julie Freeman made several material misrepresentations throughout the Agreement.

76.    Julie Freeman has failed to follow the terms of the Agreement, both by making material misrepresentations and failing to deliver assets of Creekview.

77.    As a result, Julie Freeman has breached the Agreement.

78.    Buyers are entitled to a judgment in favor for the purchase price of Creekview in an amount not less than $625,000.

## Count Five
### (Punitive Damages against All Defendants)

79.    Buyers restate the previous paragraphs as if stated herein.

80.    Defendants' actions entitle Buyers to punitive damages under O.C.G.A. § 51-12-5.1, as it amounts to clear and convincing evidence the Defendants' actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to the consequences of their actions.

81.    Under such circumstances, punitive damages are necessary to punish Defendants and deter others from engaging in a similar course of conduct.

## Count Six
### (Attorney's Fees and Costs)

82.    Buyers restate the previous paragraphs as if stated herein.

83.    Defendants' have been stubbornly litigious, acted in bad faith, and have caused Plaintiffs unnecessary trouble and expense.

84.     As a result of their actions, Buyers are entitled to recover their reasonable attorney's fees under O.C.G.A. § 13-6-11.

85.     Alternatively, the Agreement provides that in any dispute the prevailing party is entitled to its attorney's fees.

WHEREFORE, Buyers respectfully requests this Court enter judgment against Defendants consistent with this Complaint.

This, the 10th day of November 2021.

POOLE HUFFMAN, LLC

*/s/ Todd J. Poole*
Todd J. Poole
Georgia Bar No. 583755
Scott B. McMahan
Georgia Bar No. 706240
3562 Habersham at Northlake
Bldg. J, Suite 200
Tucker, Georgia 30084
T: (404) 373-4008
F: (888) 709-5723
todd@poolehuffman.com
scott@poolehuffman.com
Attorneys for Plaintiff

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 5.1

This is to certify I have complied with Local Rule 5.1's requirements regarding font, font size, and margins.

*/s/ Todd J. Poole*

## OFFER AND PURCHASE AGREEMENT (Business Assets)

The Buyer, Robert Ormiston and Elizabeth Giordano hereby offers and agrees to buy from its owner, the Seller, Julie Freeman, the business known as Creekview Accounting for the price and on the terms and conditions set forth below.

1.  **ASSET SALE**: This sale shall include all the assets of the business including equipment, client lists, trade fixtures, leasehold improvements, contract rights, business records, licenses, franchises, goodwill, trade secrets, supplies, and inventory (the "Business Assets").  It shall <u>not</u> include accounts receivable, bank accounts, deposits, cash, work-in-process.  The condition of all property transferred to Buyer pursuant to this Agreement is known to Buyer to be "**AS IS**."

2.  **PURCHASE PRICE**: The purchase price shall be $625,000 A good faith deposit in the amount of $10,000 will be paid upon acceptance of this Agreement.  The balance will be paid at closing.

3.  **PURCHASE PRICE ALLOCATION**:

    The Purchase Price shall be allocated as follows:

    | | |
    |---|---|
    | Covenant not to Compete: | $1,000 |
    | Goodwill: | $Balance |

4.  **COVENANT NOT TO COMPETE**: With regard to the clients listed on Exhibit A, the Seller agrees to not engage in the practice of public accounting, either in Seller's own name or under the name of another, as a principal or as an employee, within a ten (10) mile radius of the principal place of business for a period of five (5) years from the date of closing.  Regardless of location, the Seller shall not, except insofar as the restrictions are for the benefit of the Buyer:

    a.  Canvas, solicit, or accept any business from any present or past clients of the Seller's accounting firm;
    b.  Give any other person, firm, partnership, or corporation the right to canvas, solicit, or accept any business for any other accounting firm from any present or past clients of the Seller;
    c.  Directly or indirectly request or advise any present or future clients of the Seller to withdraw, curtail, or cancel its business with the Buyer;
    d.  Directly and indirectly disclose to any other person, firm, partnership, or corporation the names of past or present clients of the Seller's firm.

5.  **TRANSITION PERIOD**:  Seller agrees to devote a reasonable amount of time to the details involved in transferring the Business to Buyer for forty-two (42) days immediately following the close, not to exceed eighty (80) hours.  Seller shall be available for short communications (by phone, fax, etc.) to answer questions regarding client issues and introductions during the 12 months following closing at no charge.  The Seller agrees to be available for additional transitioning and the Buyer agrees to compensate the Seller for such time at the rate of $100.00 per hour.  Buyer and Seller will have a separate agreement that covers wages to be paid in an employer/employee relationship if one was to arise.

6.  **NOTICE TO CLIENTS**:  Buyer and Seller agree that they will notify or advise clients, of a change of ownership of the Business upon closing.  This will be accomplished in a manner suitable to both parties and may include an appropriate letter jointly written and sent to the clients.  Buyer and seller will submit a written request to each client requesting consent to transfer its file to the buyer and notify the client that its consent may be presumed it if does not respond within a period of not less than 90 days pursuant to 1.400.205 of the AICPA code of conduct.

7.  **CONDITIONS**:  This agreement is subject to the following conditions:

    a.  Buyer's inspection of and satisfaction with the assets and financial and other records, client lists, contracts, and leases of the business ("Due Diligence Contingency").

Exhibit A

Buyer shall provide Seller with a list of all documents that Buyer wishes to review as part of Buyer's due diligence investigation within five (5) days from the date of mutual execution of this agreement.  Seller shall provide the requested documents or documents containing similar information to Buyer, Buyer's counsel, or other designated representative within five (5) days of such request.

If Buyer is not satisfied with Buyer's due diligence investigation for whatever reason, Buyer may cancel this agreement provided that Buyer notifies Seller of Buyer's cancellation in writing within fifteen (15) days from the date of mutual execution of this agreement.

Buyer shall be deemed to be satisfied with Buyer's due diligence investigation and to have waived this Due Diligence Contingency unless written notice of cancellation is provided to Seller within fifteen (15) days from the date of mutual execution of this agreement.  Notwithstanding the above, Buyer may affirmatively remove this Due Diligence Contingency at any time.

b.  Seller shall reserve the right to entertain offers from other Prospective Buyers until the above conditions (7a. 7b. 7c.) are satisfied.

8.  **REPRESENTATIONS**:

Seller represents and warrants that:

a.  Seller is operating the business in compliance with all applicable laws and contracts.  This sale will not violate any laws nor cause the breach of any contract.  At closing, the business will pass all applicable inspections.

b.  There are no claims or investigations pending which would affect the business or the assets being sold.

c.  All contracts relevant to the ownership and operation of the business are complete and in effect, and there are no undisclosed amendments.

d.  All the financial information and statements furnished to Buyer are complete, accurate, prepared in a manner consistent with general accounting principles, and fairly present the financial condition of the business as of the dates stated on them.

e.  Since the date of the last financial statements furnished, there have been no material adverse changes, in the aggregate, in the assets, liabilities, revenues, expenses, or any other items shown on such statements.

f.  All assets currently used in the business are owned by Seller free from liens and encumbrances, and they are in good and operable condition.

g.  Seller shall continue to carry all existing insurance on the business, assets, and properties covered by this agreement to the closing date, and Seller assumes all risk of destruction, loss, or damage to the assets prior to the closing of this transaction.  At Buyer's request and sole expense, the amount of insurance against fire or other casualty carried on any of such assets or properties, or in respect to any operations of such business, shall be increased by such amount or amounts as Buyer shall specify.

h.  Until date of closing, Seller shall continue to operate the business in the usual way, protect its assets and goodwill, maintain good relations with suppliers, clients, and employees, and allow the Buyer to make reasonable inspections with prior consent of Seller.

Buyer represents and warrants that:

a.  Buyer will operate the Business in a professional manner.

b.  Buyer will not incur any obligations in the name of Seller.

c.  Buyer has the full authority to complete this transaction and in doing so will not violate any rule of law or contractual provision of any nature.

Seller and Buyer warrant that these representations are true, shall be true as of date of closing, and shall survive.  Seller and Buyer hold Brannon Poe, CPA, LLC doing business as Poe Group Advisors, (PGA) harmless from any and all damage resulting from their falsity.

**9.**   **TAXES AND EXPENSES**:

a.  Rent, personal property taxes, insurance, payroll, vacation pay, and other expenses of the business not otherwise provided for in this agreement shall be prorated to date of close.

b.  Except as otherwise noted in this agreement, each party shall pay when due all operating costs incurred while that party is in possession and hold the other party harmless therefrom.

c.  Each party shall pay its own attorneys and other advisors.

**10.**   **COMPLETION OF WORK IN PROCESS**:  Buyer will complete all work-in-process from the date of closing.  Fees billed for the completed work-in-process shall be allocated pro rata to Seller and Buyer based on the ratio of the amount of work done by each (before and after the date of closing respectively), at standard billing rates.

**11.**   **CONTRACTS, ASSUMED LIABILITIES**:  The Seller shall transfer to Buyer all contracts used in the operation of the business (i.e. alarm system lease, telephone systems lease, equipment maintenance agreements, Yellow Pages advertising, etc.), and the Buyer shall assume the obligations for these contracts incurred after closing.  Buyer assumes no other liabilities of Seller.

**12.**   **BROKER REPRESENTATIONS AND FEES**:  Buyer acknowledges that Brannon Poe, CPA, LLC doing business as Poe Group Advisors, (PGA) has not verified and will not verify the representations of Seller.  Seller acknowledges that PGA has made no representations concerning Buyer's ability to complete this transaction or to successfully operate the business, and relies solely on Buyer's representation and not on PGA.  Should any such representations of Seller or Buyer be untrue, Buyer and Seller agree to look solely to each other for relief and shall release, hold harmless, indemnify, and defend PGA from any such claims.  Seller agrees that Buyer or closing agent will make arrangements to pay PGA's fees from the Seller's proceeds at closing.

**13.**   **CLOSING DATE**:  The estimated date for closing is July 24, 2021. Buyer and Seller shall make their best efforts to close on or before that date.  Possession shall change at closing.

**14.**   **ARBITRATION**:  Any dispute relating to this agreement by any party or the broker shall be decided by binding arbitration.  In any suit or arbitration on this agreement, the prevailing party shall be entitled to reasonable attorney's fees and costs.

**15.**   **INDEMNITY**: Seller shall indemnify Buyer against any and all claims, demands, losses, and liabilities respecting the business or otherwise, including interest, penalties, and reasonable attorney's fees, that Buyer shall incur by reason of Seller's breach of any representation, warranty, covenant, promise, or agreement covered by this agreement or in any Exhibit, schedule, or other instrument attached hereto or furnished, or to be furnished, by Seller under this agreement.

**16.**   **ACCEPTANCE**:  This offer shall expire unless it is accepted in writing by Seller and that acceptance is communicated to Buyer by 11:59 p.m. on Monday, June 28, 2021.  Any later acceptance shall constitute a counteroffer.

**17.**   **COMPLETE AGREEMENT**:  The entire agreement of the parties relating to the sale of the business is set forth in this agreement and can only be modified in writing.  This agreement shall bind and benefit the parties and their legal successors.

**18.**   **ACKNOWLEDGMENT AND GUARANTEE**:  By signing below, Buyer and Seller acknowledge that they have read and understand this agreement and have received a copy of it.  The undersigned warrant that their signatures are legally sufficient to bind the Buyer and Seller, respectively, and personally guarantee performance hereunder.

**Buyer**:

DocuSigned by:

x _Bob Ormiston_____

C4EBC2B697AE431...

Date: __6/28/2021_____

**Seller**:

DocuSigned by:

x _Julie Freeman_____

88C4DDEC6689400...

Date: __6/28/2021_____

3562 Habersham at Northlake
Building J, Suite 200
Tucker, Georgia 30084



## POOLE
## HUFFMAN

October 15, 2021

Tel: (404) 373-4008
Fax: (888) 709-5723
Poolehuffman.com

**VIA FIRST CLASS MAIL, CERTIFIED MAIL, AND EMAIL**
**(julie.freeman@creekviewaccountingservices.com)**

Julie Freeman
3020 Keeneland Blvd
McDonough, Georgia 30252

**Re:    Demand for Rescission**

Dear Ms. Freeman:

This firm has been retained by Robert Ormiston and Elizabeth Giordano (the "Buyers") in relation to your fraudulent actions to induce the Buyers to purchase the assets of Creekview Accounting Services, LLC ("Creekview"). You may direct all future correspondence related to this action to me. In short, you have fraudulently induced the Buyers to purchase Creekview, failed to turn over all assets of Creekview, wasted its assets, and caused harm to the Buyers in the process. The Buyers demand rescission of the sale and return of the full purchase price.

As you know, on June 28, 2021, you executed an Offer and Purchase Agreement (Business Assets) for the assets of Creekview (the "Agreement"). As part of that Agreement, you represented:

- "There are no claims or investigations pending which would affect the business or the assets being sold." ¶ 8.b.

- "All the financial information and statements furnished to Buyer are complete, accurate, prepared in a manner consistent with general accounting principles, and fairly present the financial condition of the business as of the dates stated on them." ¶ 8.d.

- "Since the date of the last financial statements furnished, there have been no material adverse changes, in the aggregate, in the assets, liabilities, revenues, expenses, or any other items show on such statements." ¶ 8.e.

Exhibit B

Julie Freeman
October 15, 2021
Page 2 of 3

- "All assets currently used in the business are owned by Seller free from liens and encumbrances, and they are in good and operable condition." ¶ 8.f.

- "Until date of closing, Seller shall continue to operate the business in the usual way, protect its assets and goodwill, maintain good relations with suppliers, clients, and employees, and allow the Buyer to make reasonable inspections with prior consent of Seller." ¶ 8.h.

Each of these representations has turned out to be false. First, multiple clients have stated they have not heard from you in months and accused you of malpractice in the handling of their account. Second, multiple clients have either canceled their account with Creekview or had previously done so. Third, the financials you provided have substantially overstated the revenue of Creekview. The financial information provided during due diligence substantially overstated the revenue of Creekview by including clients who had previously discontinued service due to neglect and malpractice.

Beyond the representations, you failed to abide by the basic terms of the Agreement. You have not provided a complete client list, even though the clients of Creekview are an asset of Creekview. You have not participated in the orderly transition of Creekview's assets to the Buyers, despite the Agreement explicitly requiring you to do so. You have not provided the operating procedures or a complete contact list of Creekview, despite previously agreeing to do so. Many clients contacted by Buyers have stated they never received any correspondence from you informing them the sale of Creekview had occurred.

In short, you have defrauded my clients. The issues I have listed above are the issues that are readily apparent and should not be construed as an exhaustive list of your fraudulent conduct. Please accept this letter as formal notice of the Buyers' demand to rescind the Agreement. He will return what meager assets you have provided, and in turn, you will return the $625,000 purchase price. You have ten (10) days to comply with this demand.

Should you ignore this letter or fail to return the purchase price, the Buyers will proceed directly to arbitration. They will pursue claims, including but not limited to, fraud, rescission, breach of contract, conversion, attorney's fees, and punitive damages.

Julie Freeman
October 15, 2021
Page 3 of 3

 Again, I am providing you with ten (10) days to return the purchase price. Please contact me for payment instructions.

Best regards,

Todd J. Poole
